**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| BECKY A. MEDVETZ,           ) | |
| ) | CASE NO. 1:08-CV-01879 |
| Plaintiff,           ) | |
| ) | |
| v.           ) | JUDGE PATRICIA A. GAUGHAN |
| ) | |
| MICHAEL J. ASTRUE,           ) | MAGISTRATE JUDGE GREG WHITE |
| Commissioner of Social Security           ) | |
| ) | **REPORT AND RECOMMENDATION** |
| Defendant.           ) | |

Plaintiff Becky A. Medvetz ("Medvetz") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying in part Medvetz's claim for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, *et seq*. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.

For the reasons set forth below, the Magistrate Judge recommends that the final decision of the Commissioner be VACATED and REMANDED for further proceedings consistent with this Report and Recommendation.

**I. Procedural History**

On November 17, 2004, Medvetz filed an application for POD and DIB alleging a disability onset date of March 31, 2002 and claiming that she was disabled due to fibromyalgia and chronic fatigue syndrome.[1] Her application was denied both initially and upon reconsideration. Medvetz timely requested an administrative hearing.

On October 1, 2007, Administrative Law Judge Edmund Round ("ALJ") held a hearing during which Medvetz, represented by counsel, testified. Bruce Holderead, a certified rehabilitation counselor, testified as the vocational expert ("VE"). On November 21, 2007, the ALJ found Medvetz was entitled to a closed period of disability from May 18, 2005 until December 12, 2006. However, the ALJ also found that she was able to perform her past relevant work as a cashier at all other relevant times and, therefore, was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review. Medvetz filed an appeal to this Court.

On appeal, Medvetz claims the ALJ erred by: (1) failing to give appropriate weight to the opinion of a treating physician regarding her RFC; (2) failing to meet the burden of showing medical improvement; and (3) improperly evaluating her credibility. (Doc. No. 11.)

**II. Evidence**

*Personal and Vocational Evidence*

Born on September 29, 1956 and age 51 at the time of her administrative hearing, Medvetz is a "person closely approaching advanced age." *See* 20 C.F.R. § 404.1563(d). She has

---

[1] During the hearing, Medvetz's counsel orally moved to amend the alleged onset date of disability to October 1, 2003. (Tr. 385.)

2

a high school education and past relevant work as a cashier, supermarket stock clerk, shoe store sales clerk, and shoe store manager. (Tr. 21, 387.)

*Medical Evidence*

On January 3, 2002, Medvetz complained of lower back pain that she had experienced for one month, (Tr. 267.) She was also noted to have anxiety and depression, and was prescribed Paxil and Skelaxin. *Id*.

On August 15, 2002, Medvetz visited the doctor for a check-up and to obtain a refill of the Paxil prescription. (Tr. 265.) She had gained seventeen pounds since February of 2002. She was diagnosed with insomnia, cephalgia, and anxiety. *Id*.

On September 1, 2004, Medvetz visited the Fibromyalgia and Fatigue Center ("FFC"), and was found to have moderate to severe responses in eighteen of twenty fibromyalgia trigger points.[2] (Tr. 102.) She exhibited no limitation in range of motion of her spine, had a normal gait, and presented with no other clinical abnormalities. (Tr. 102-03.) Medvetz reported that she

---

[2] According to the National Institute of Health:

A doctor familiar with fibromyalgia ... can make a diagnosis based on two criteria established by the American College of Rheumatology (ACR): a history of widespread pain lasting more than 3 months and the presence of tender points. Pain is considered to be widespread when it affects all four quadrants of the body; .... ACR also has designated 18 sites on the body as possible tender points. For a fibromyalgia diagnosis, a person must have 11 or more tender points. One of these predesignated sites is considered a true tender point only if the person feels pain upon the application of 4 kilograms of pressure to the site. People who have fibromyalgia certainly may feel pain at other sites, too, but those 18 standard possible sites on the body are the criteria used for classification.

Nat'l Inst. of Arthritis, Musculoskeletal and Skin Diseases, Nat'l Inst. of Health, Dep't of Health & Human Servs., *Fibromyalgia*, available at:
http://www.niams.nih.gov/Health_Info/Fibromyalgia/default.asp

suffered from hypothyroidism for nineteen years and that her fatigue had worsened since the onset of menopause.  (Tr. 103.)  She did not receive pain medication or trigger point injections, but was advised of stress reduction techniques.  (Tr. 104.)

On October 25, 2004, Medvetz returned to the FFC Center reporting that she had increased energy with fewer problems sleeping after changes to her thyroid medication, but still suffered from pain in her back, hips, feet, and neck.  (Tr. 105.)  She was diagnosed with fibromyalgia and chronic fatigue immune deficiency syndrome.  *Id*.  On November 16, 2004, Medvetz stated that she was not sleeping well, but reported increased energy levels.  (Tr. 107.)  She also reported lower back spasms and mild numbness occurring mostly in the evening.  *Id*.  On December 14, 2004, she reported that her condition was "horrible" with continued difficulty sleeping.  (Tr. 108.)

Herschel Pickholtz, Ed.D., a state agency consulting psychologist, performed a psychological evaluation on December 23, 2004.  (Tr. 173-77.)  He assigned Medvetz a Global Assessment of Functioning ("GAF") score of 65, indicating only mild impairments in psychological function.[3]  *Id*.  He concluded that, "the main reason she was not working relates to her physical problems."  *Id*.

Between December 28, 2004 and February 7, 2005, Medvetz was treated at the Duffy & Johnson Chiropractic practice.  (Tr. 356-362.)

On February 28, 2005, state agency reviewing physicians concluded that Medvetz's

---

[3] A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.  A person who scores in this range may have a depressed mood, mild insomnia, or occasional truancy, but is generally functioning pretty well and has some meaningful interpersonal relationships.  *See Diagnostic and Statistical Manual of Mental Disorders 34* (Am. Psych. Assoc., 4th ed. revised, 2000).

allegations of pain and limitation from fibromyalgia and chronic fatigue syndrome were unsupported by the medical evidence of record and determined that she retained the ability to perform a full range of medium work.  (Tr. 178-84.)  In addition, state agency reviewing consultative psychologists determined that Medvetz did not have a severe mental impairment, and had, at most, only mild functional limitations.  (Tr. 186, 196.)

On May 18, 2005, Medvetz was seen by Alla Model, M.D.  (Tr. 201-210.)  Examination revealed "mild" pain to palpation of the lower back, with good flexion and extension, normal motor and sensory reflexes, and negative straight leg raising.  (Tr. 202.)  Medvetz also exhibited normal gait, normal range of motion in her spine, intact muscular strength, but tested positive in sixteen of eighteen fibromyalgia trigger points.  *Id*.  Medvetz reported back aches and insomnia. Dr. Model recommended exercise and water therapy, possible use of muscle relaxants, and Elavil and Lodine for insomnia and pain control.  *Id*.  X-ray studies showed no fracture and well-maintained intervertebral disc spaces in the cervical spine, but showed a 7mm subluxation of the disc space at L4-5.  (Tr. 348.)

On June 26, 2005, Medvetz again visited Dr. Model and complained that her medications were not helping with her pain and insomnia.  (Tr. 334.)  She was diagnosed with fibromyalgia and depression.  *Id*.

On July 20, 2005, treatment notes from Dr. Model indicate that Medvetz was sleeping better with a higher dose of Elavil but her pain was unimproved.  (Tr. 336.)  Medvetz attempted attending body sculpting classes but "could not tolerate."  *Id*.  Dr. Model suggested walking and water exercises.  *Id*.

On July 30, 2005, Medvetz was referred for MRI imaging, which revealed moderately

severe canal and foraminal stenosis at L4-5.  (Tr. 249.)

On September 29, 2005, Dr. Model's treatment notes indicate Medvetz was sleeping better with minimal somnolence.  (Tr.338.)  Medvetz informed Dr. Model that she had seen a psychiatrist.  *Id*.  Medvetz was positive for eighteen of eighteen tender points.  *Id*.

On December 20, 2005, Dr. Model noted that Medvetz had attended stretching classes, was pleased with the result of her Flexeril prescription, had been sleeping through the night, and showed improvement in her fibromyalgia.  (Tr. 340.)

On January 9, 2006, Medvetz was seen by neurosurgeon Teresa D. Ruch, M.D., for low back pain, tingling in both legs, and fatigue.  (Tr. 247.)  Medvetz reported that she smoked a pack of cigarettes daily.  (Tr. 247.)  Dr. Ruch observed full motor strength, normal reflexes and indicated that an MRI scan showed an L4,5 spondylolisthesis with a right disc herniation.  *Id*.  The doctor advised conservative treatment with physical therapy.  (Tr. 247.)

In February 2006, Dr. Ruch referred Medvetz for a course of physical therapy. Medvetz reported that she could cook, perform self-care, grocery shop, and do some household cleaning and banking tasks. (Tr. 236.)  She appeared to tolerate therapy well, but did not continue her treatments after April 2006 (Tr. 238-39, 243).

On June 21, 2006, Medvetz underwent spinal fusion at L4-5, and tolerated the procedure well.  (Tr. 300, 306-07.)  Her surgeon indicated that Medvetz was ambulating within three days after surgery.  (Tr. 300.)

On July 3, 2006, Medvetz visited Dr. Ruch for a post-operative examination.  (Tr. 290.) Medvetz reported that she was "doing much better than preoperatively" and that her leg numbness was completely resolved.  Medvetz stated she was walking one to two hours a day in

6

ten to fifteen minute stretches and Dr. Ruch advised her to continue her walking program. *Id.*

On July 24, 2006, Dr. Ruch noted that Medvetz's stitches had been removed, her x-rays "look fine," and that, except for some difficulty sitting, Medvetz "feels pretty good." (Tr. 291.)

On September 11, 2006, Dr. Ruch indicated Medvetz was "doing quite well" and that she was "pain-free." (Tr. 292.) Dr. Ruch believed Medvetz had acceptable fusion and advised her to wean herself off using a corset. *Id.*

On December 11, 2006, Dr. Ruch indicated Medvetz reported "[h]aving no problems whatsoever." (Tr. 293.) The doctor indicated her x-rays "look good and looks like she is fusing." Medvetz was told she did not need to return for six months. *Id.* The x-ray, however, did show grade I anterolisthesis of L4 on L5 measuring 4mm. (Tr. 295.) Ten days prior, a different physician prescribed Medvetz Percocet for pain. (Tr. 284.)

On January 12, 2007, Medvetz visited her family doctor with complaints of back pain. (Tr. 282.) At that time, and throughout the first half of 2007, Medvetz was diagnosed with fibromyalgia, insomnia, and depression. (Tr. 277-82.)

On September 6, 2007, Angela M. Bennett, M.D., Medvetz's family doctor, completed a "Disability Questionnaire with Physical Capacities Evaluation." Dr. Bennett indicated Medvetz's health status was "Good/Stable with [treatment]" but further opined that Medvetz could only stand or walk 2 hours a day, sit for 2 hours a day, lift or carry up to 5 pounds, and was "extremely limited" in most postural activities. (Tr. 270-71.) Medvetz's medical conditions were listed as fibromyalgia, chronic back pain, chronic insomnia, and depression. (Tr. 269.) Dr. Bennett checked a box stating Medvetz was "unemployable" and indicated her restrictions would last twelve months or more. (Tr. 272.) She also indicated that Medvetz should see her

7

neurosurgeon, because, according to Medvetz, her back pain is worse.  (Tr. 270.)

*Hearing Testimony*

At the hearing, Medvetz testified to the following.  She stopped working because she could not handle the physical aspects of work due to pain.  (Tr. 388-89.)  Her pain level since her alleged disability onset date was "excruciating" and the fatigue was "overwhelming."  (Tr. 389.)  She visited the FFC, despite the fact that her visits were not covered by insurance, because her pain was "unbearable."  (Tr. 391.)  She was tired all day long due to poor sleep and some nights she could not sleep at all.  (Tr. 392.)  After she could no longer afford treatment at the FFC, she began treating with her family doctors – Dr. Webb and Dr. Stiggers.  (Tr. 393, 395.)  Later she was treated by Dr. Model, a rheumatologist.  *Id*.  She elected to have surgery on her spine after a few months of physical therapy failed to provide relief.  (Tr. 397.)  After the surgery, she was told not to lift anything heavier than a gallon of milk, but was instructed to walk several times daily up to ten minutes at a time.  (Tr. 399-400.)  She denied telling Dr. Ruch that she was pain free.  (Tr. 401.)  At the time of the hearing, she was taking three Percocet pills daily to help ease her pain.  (Tr. 404.)  She spent about six hours of the day in a reclined position and did activities such as loading the dishwasher, feeding the dogs, and dusting in short spurts.  (Tr. 405.)  She did not attend water exercise classes because she could not afford them and had no transportation.  (Tr. 412.)

The VE testified that Medvetz's past work as a sales clerk was semi-skilled and performed at the light exertional level; and, that her past work as an assistant manager was skilled, but also performed at the light exertional level.  (Tr. 415-16.)  Medvetz's past work as a supermarket stock clerk was performed at the heavy exertional level.  (Tr. 416.)

8

The ALJ proposed two hypothetical worker scenarios to the VE, asking him to assume in both that the person could work eight hours a day, five days a week. In the first scenario, the ALJ asked the VE to assume a 51-year old worker with a high school diploma and the following limitations: an ability to perform a range of light work; an ability to sit, stand or, walk six hours each in an eight-hour work day; an ability to lift, carry, push, or pull ten pounds frequently and twenty pounds occasionally; an inability to use ladders, ropes, or scaffolds; and, an inability to be exposed to work hazzards such as unprotected heights and unprotected moving machinery. (Tr. 416-17.) The VE opined that such a person could perform Medvetz's past work as a cashier. *Id*. In the second scenario, the ALJ asked the VE to assume a worker with the following limitations: a 49-year old high school graduate; ability to perform a range of sedentary work; ability to stand or walk two hours in an eight-hour work day and sit for six; ability to lift, carry, push, or pull no more than ten pounds; and, the same environmental limitations as posited above. (Tr. 417-18.) The VE again opined that such a person could perform Medvetz's past work as a cashier. *Id*. The VE further testified that a person who missed four days of work per month would be unemployable. (Tr. 419.)

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a

9

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[4]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Medvetz was insured on her alleged disability onset date, March 31, 2002, and remained insured through March 31, 2007. (Tr. 16.) Therefore, in order to be entitled to POD and DIB, Medvetz must establish a continuous twelve month period of disability commencing between March 31, 2002 and March 31, 2007. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

### IV. Summary of Commissioner's Decision

The ALJ found Medvetz established a medically determinable, severe impairment, due to fibromyalgia, chronic fatigue syndrome, and a herniated lumbar disc after surgery. However, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 before May 18, 2005 or after December 11, 2006. Outside of the

---

[4] The entire five-step process entails the following: First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

closed period of disability, Medvetz was deemed capable of performing her past work as a cashier, and had a Residual Functional Capacity ("RFC") for a limited range of light work. The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Medvetz is not disabled.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Medvetz claims the ALJ erred by: (1) failing to give appropriate weight to the opinion of a treating physician regarding her RFC; (2) failing to meet the burden of showing medical improvement; and (3) improperly evaluating her credibility. (Doc. No. 11.) Each will be discussed in turn.

### *Treating Physician*

Medvetz argues that the ALJ failed to give appropriate weight to the opinion of a treating

physician regarding her RFC.  Specifically, Medvetz argues that the ALJ rejected the opinion of Dr. Bennett that Medvetz was limited to a total of two hours standing or walking in an eight-hour workday, two hours sitting in an eight-hour workday, and lifting a maximum of five pounds. (Pl.'s Br. at 14.)

The opinion of a treating physician, psychologist, or other acceptable medical source is given greater weight than those of physicians hired by the Commissioner.  *See Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048 (6th Cir. 1983).  Nonetheless, a treating physician's opinion is entitled to substantial weight only if it is supported by clinical or diagnostic findings. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981).  An ALJ may disregard a treating physician's opinion where no medical documentation is presented, where there is no explanation of a nexus between the conclusion of disability and physical findings, or where a treating physician's conclusion is not substantiated by medical data.  *See Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 212 (6th Cir. 1986); *Villarreal v. Sec'y of Health & Human Servs.,* 818 F.2d 461, 463 (6th Cir. 1987).  In deciding how much weight to ascribe to a treating source's opinion, the ALJ must consider factors such as the "length;" "nature and extent of the treatment relationship;" the physician's specialty; and the "consistency" of the opinion. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d).  Further, an ALJ is not bound by the opinions of a claimant's treating physicians, though he must set forth his reasons for rejecting them.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Shelman v. Heckler*, 821 F.2d 316, 320-21 (6th Cir. 1987).

The ALJ accorded "little weight" to Dr. Bennett's opinion due to perceived inconsistencies and a lack of support in the treatment record.  (Tr. 24.)  The ALJ explained his

finding as follows:

> Dr. Bennett, a family practice specialist, describes Ms. Medvetz's health status as good/stable with treatment, and opined that she would be able to participate in aquatherapy or physical therapy.  However, Dr. Bennett then opined, inconsistently, that Ms. Medvetz could only sit for two hours in an eight hour work day, and for only 15 minutes without interruption, that she could stand and walk only a combined total of 2 hours in an 8 hour day, and could lift up to 5 pounds frequently.  When asked to substantiate her findings with observations and medical evidence, Dr. Bennett failed to provide any information.  Similarly, Dr. Bennett did not support her opinion that Ms. Medvetz was unable to perform any pushing or pulling, and her ability to balance, stoop, kneel, crouch and crawl was extremely limited.  Finally, Dr. Bennett's treatment notes do not document Ms. Medvetz' [sic] limitations, and contain no observations regarding her inability to sit for more than 15 minutes, or to perform other functions such as standing, pushing, balancing, stooping, crouching, or crawling (Exhibit 13F4-12).  In fact, the only observation is that Ms. Medvetz' [sic] pain improved on medication (Exhibit 13F12).

(Tr. 24-25.)

The ALJ clearly followed the proper procedures by setting forth his reasons for discounting the opinion of Dr. Bennett.  The reasons given – inconsistency and lack of substantiating treatment notes – have been found by other courts as acceptable criteria for rejecting a treating physician's opinion.  Although Medvetz disagrees with the ALJ's characterization of Dr. Bennett's opinion, this Court does not conduct a *de novo* review and cannot remand a matter simply because it might have interpreted the evidence of record differently than the ALJ.  Here, the ALJ's explanation is not unreasonable and can be supported by the record.

Furthermore, to the extent Dr. Bennett's statement constitutes an opinion that Medvetz is unemployable, disabled, or an RFC finding, it is not entitled to any special weight.  Statements from any medical source that the claimant has a particular RFC do not constitute medical opinions, but rather comments on an issue reserved to the ALJ.  *See* 20 C.F.R. § 404.1527(e);

13

SSR 96-5p.  A physician's commentary on issues reserved to the ALJ, such as a claimant's RFC, are thus given no special significance.  *Id.*  The regulations expressly place the responsibility of determining a claimant's RFC on the Commissioner.  20 C.F.R. § 404.1527(e)(2).  Thus, Medvetz's first assignment of error is without merit.

*Medical Improvement*

Medvetz also argues that the ALJ erred by failing to meet the burden of showing medical improvement after the ALJ had determined that she was entitled to a closed period of disability. (Pl.'s Br. at 16.)

Under 20 C.F.R. § 404.1594(b)(4)(i), medical improvement may be demonstrated by an increase in a claimant's functional capacity to perform basic work activities or by a decrease in the severity of an impairment.  The ALJ found that Medvetz had demonstrated medical improvement as of December 12, 2006 and offered the following explanation:

> X-rays on December 11, 2006 showed that Ms. Medvetz' [sic] dextroscoliosis had been reduced and that the disc spaces at L5-5 (sic) were well preserved (Exhibit 14F7).  Dr. Ruch's office note for December 11 says in Part, "X-rays look good…."  Ms. Medvetz told Dr. Ruch that she was "doing fine…feeling good" and having no problems whatsoever" (Exhibit 14F5).

(Tr. 22.)

Medvetz contends that this alone does not constitute substantial evidence of medical improvement, especially in light of Dr. Bennett's above discussed opinion.  The Court disagrees. First, as the ALJ did not err in ascribing little weight to Dr. Bennett's opinion, the fact that it conflicts with the ALJ's finding of medical improvement is immaterial.  Second, the presence of some other evidence that could lead to a contrary conclusion does not render the evidence supporting the ALJ's decision insubstantial.  A decision should be affirmed if it is supported by

14

substantial evidence.  It is immaterial if substantial evidence also supports a claimant's position. *See, e.g., Kirby v. Comm'r of Soc. Sec.*, 37 Fed. Appx. 182, 183 (6th Cir. 2002) (an ALJ's decision must be upheld if substantial evidence supports it regardless of whether substantial evidence also supports the claimant's position); *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) (a court must uphold the decision of the Commissioner even when substantial evidence exists to support both the Commissioner and the claimant);  *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) (substantial evidence can exist to support and detract from the ALJ's decision). Medvetz appears to misconstrue the substantial evidence standard, which  "presupposes that there is a zone of choice within which the [ALJ] can go either way, without interference by the courts.  An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." *Williamson v. Apfel*, 1998 U.S. App. LEXIS 30010 at *13 (6th  Cir. 1998) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Medvetz cannot establish that the ALJ's opinion was unsupported by substantial evidence by merely pointing to evidence of record that could support the opposite conclusion.

The ALJ noted that within weeks of the June 21, 2006 surgery performed by Dr. Ruch, Medvetz reported that the numbness in her legs had completely resolved.  (Tr. 21.)  Subsequent visits to Dr. Ruch also indicate continued improvement, culminating in the December 11, 2006 visit when it was reported that Medvetz was "having no problems at all."  Thus, the x-rays and Dr. Ruch's treatment notes constitute substantial evidence capable of supporting a finding of medical improvement.  As such, Medvetz's second assignment of error is without merit.

***Claimant's Credibility***

Finally, Medvetz argues that the ALJ erred by improperly evaluating her credibility.

15

(Pl.'s Br. 17-20.) The Commissioner responded by arguing that substantial evidence supported the ALJ's credibility assessment.[5]

A claimant's subjective statements concerning her symptoms are not enough to establish disability. *See* SSR 96-7p, Introduction. When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment. Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms." *Id*. If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. *Id*. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight." SSR 96-7p, Purpose section; *see also Felisky v. Bowen,* 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"); *Cross*, 373 F. Supp. 2d at 733 (stating that an ALJ, in a

---

[5] Medvetz's argument suggests that the ALJ did not conduct a proper credibility analysis. This argument clearly implicates a procedural issue. Thus, the Commissioner's argument that the record *could* support a finding that Medvetz's testimony was not fully credible does not squarely address whether the ALJ actually conducted a proper credibility analysis.

16

unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* SSR 96-7p, Purpose. Beyond medical evidence, there are seven factors that the ALJ should consider.[6] The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ was clearly conscious of his responsibility to conduct a credibility analysis. He accurately set forth the factors to be considered. (Tr. 23.) The ALJ found that Medvetz's impairments could reasonably be expected to produce the symptoms alleged, but that Medvetz's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. (Tr. 24.) It is undisputed that Medvetz was diagnosed with fibromyalgia.[7] As explained by other courts, it is difficult to find corroborative medical

---

[6] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p, Introduction; *see also Cross v. Comm'r of Soc. Sec.*, 375 F. Supp. 2d 724, 732 (N.D. Ohio 2005).

[7] The Court recognizes that a diagnosis alone does not indicate the functional limitations caused by the disability. *See Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146,151 (6th Cir. 1990) (diagnosis of an impairment does not indicate the impairment is of disabling severity).

evidence fibromyalgia cases.

> Fibromyalgia, also referred to as fibrositis, is a medical condition marked by "chronic diffuse widespread aching and stiffness of muscles and soft tissues." *Stedman's Medical Dictionary for the Health Professions and Nursing* at 541 (5th ed. 2005). We note also that ours is not the only circuit to recognize the medical diagnosis of fibromyalgia as well as the difficulties associated with this diagnosis and the treatment for this condition. *See Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) (noting that fibromyalgia's "causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective"); *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) ("Fibromyalgia, which is pain in the fibrous connective tissue of muscles, tendons, ligaments, and other white connective tissues, can be disabling."); *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2nd Cir. 2003) (noting that "a growing number of courts . . . have recognized that fibromyalgia is a disabling impairment and that there are no objective tests which can conclusively confirm the disease") (internal quotation marks and citations omitted); *Welch v. Unum Life Ins. Co. of Am.*, 382 F.3d 1078, 1087 (10th Cir. 2004) ("'Because proving the disease is difficult . . ., fibromyalgia presents a conundrum for insurers and courts evaluating disability claims.'") (*quoting Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1067 (9th Cir. 1999)).

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 n. 3. (6th Cir. 2007); *see also Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 817-18 (6th Cir. 1988); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 915 (3rd Cir. 2003). Therefore, objective medical evidence corroborating allegations of pain will most likely be nonexistent, resulting in even greater emphasis on the credibility of a claimant's subjective allegations of the severity of her pain.

In his opinion, the ALJ discusses Medvetz's fatigue and whether it stems from insomnia or CFS. However, glaringly absent is any discussion concerning Medvetz's allegations of disabling pain. (Tr. 24.) The ALJ's enumeration of the factors in 20 C.F.R. 404.1529(c) does not cure his failure to actually discuss these factors as they pertained to Medvetz. When addressing Medvetz's credibility, the ALJ neglects to explain how Medvetz's daily activities

18

undermine her allegations of disabling pain, how her medications alleviate or fail to alleviate her pain, what treatments were available other than medication, or what, if any, other factors concerning her functional limitations and restrictions were relevant.  The ALJ found Medvetz was credible when she articulated her applicable symptoms coinciding with her closed period of disability, but not entirely credible when she did the same for other relevant periods before and after.  Although the ALJ is certainly not bound to find a claimant entirely credible or incredible, finding a narrow window of veracity further highlights the need for an analysis that comports with SSR 96-7p.  "[A court] cannot uphold a decision by an administrative agency … if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).  Because the ALJ did not provide an analysis that is sufficiently specific, Medvetz's argument that the ALJ failed to properly articulate a basis for his credibility finding is well-taken.

For the foregoing reasons, the Magistrate Judge recommends this case be remanded so that the ALJ may issue a new decision containing an analysis that sufficiently explains the basis of his conclusions with enough clarity to allow a meaningful review.

### VII.  Decision

Accordingly, the decision of the Commissioner should be VACATED and the case REMANDED for further proceedings consistent with this Report and Recommendation.

s/ Greg White  
U.S. Magistrate Judge

Date: March 5, 2009

**OBJECTIONS**

  Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).